MIDDLETON DEVELOPMENT CORP v GUST

OPINION OF THE COURT

1. CONTRACTS—PARTIES' INTENTION.

Operation of a boat livery by defendants on their property bordering a large lake created by plaintiff developer was contrary to the intention of the parties in their written agreement granting flowage rights over their land by defendants to plaintiff in exchange for plaintiff's agreement to rough-grade a road around defendant's land where a reading of the agreement shows that the whole purpose of it was to assure orderly development of a residential area fronting on a private lake to which only property owners would have access.

DISSENT BY HOLBROOK, J.

2. CONTRACTS—AMBIGUITY—PUBLIC EASEMENT—JUDICIAL INTERPRETATION.

*The phrase "public easement", as used in the parties' written agreement prohibiting defendants from granting a public easement across their land to a large private lake created by plaintiff developer, is not inherently ambiguous and does not require judicial interpretation of its meaning; therefore, the trial court's holding that defendants' operation of a boat livery upon their property bordering the lake was not the permitting of a "public easement", in violation of their contract with plaintiff, was not error.*

3. CONTRACTS—AMBIGUITY—JUDICIAL INTERPRETATION.

*Judicial construction or interpretation of contractual provisions is required only where a clear ambiguity exists.*

4. CONTRACTS—AMBIGUITY—PUBLIC EASEMENT—JUDICIAL INTERPRETATION.

*Defendants' operation of a boat livery on their property bordering*

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 17 Am Jur 2d, Contracts § 18 *et seq.*
[2–4] 17 Am Jur 2d, Contracts § 240 *et seq.*
[3] 17 Am Jur 2d, Contracts § 22.

*a large private lake created by plaintiff developer was not the permitting of a public easement in violation of their contract with plaintiff since defendants' action did not create any rights in the general public nor did they convey any property interest to the general public, to a public service corporation, or to a public utility.*

Appeal from Gladwin, Robert H. Campbell, J. Submitted Division 3 May 10, 1972, at Grand Rapids. (Docket No. 12064.) Decided December 6, 1972.

Complaint by Middleton Development Corp. against Donald Gust and Jean C. Gust for breach of contract and injunctive relief. Judgment for defendants. Plaintiff appeals. Reversed.

*Wilson & Stone,* for plaintiff.

*Hughes & Trucks,* for defendants.

Before: R. B. BURNS, P. J., and HOLBROOK and O'HARA,* JJ.

O'HARA, J. Plaintiff real-estate developer desired to create one large lake from three small lakes then existing on the involved property. It proposed to do this by building a dam which would raise the water level. By virtue of a written agreement, dated October 1, 1965, defendants—who were the only land owners on the proposed lake besides the plaintiff—granted flowage rights over their land to plaintiff corporation in exchange for a promise to rough-grade a road around defendants' land.

Three years passed. The new lake reached a maximum water level. Plaintiff completed the construction of roads upon its property and obtained

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

final state approval of the dam and subdivision plans. During this period, it sold several lakefront lots to the public.

Then plaintiff sought to complete its contractual obligation by constructing the road on defendants' property. This defendants would not allow. At best, they asserted, plaintiff had only a reasonable time within which to perform. Too much time had elapsed. Thus, the agreement was null and void. Consequently, they (defendants) were no longer bound and were free to commence operation of a boat livery upon the new lake.

At trial both parties argued as to whether operation of the boat livery constituted a breach of defendants' agreement not to permit a public easement across their land with access to the lake. The learned trial judge found no breach of the parties' agreement. This appeal of right by plaintiff followed.

Since we do not agree with the parties' formulation of the question on appeal, we thus state the issue: What was the *intention* of the parties as expressed in the written agreement?

The plaintiff is a corporate real estate developer. It conceived the residential development on Lake Lochbrae. It arranged the financing. It invested some $98,000 in the project. To date, over $200,000 in residential lots have been sold to the public. As such, the public relied on plaintiff's representation that only property owners had access to the lake.

The whole purpose of this agreement was to assure the orderly development of a residential area fronting on a private lake. To this end, defendants agreed that if they subdivided their land that they would not sell more than two rows of lakefront lots and that they would restrict their property in the same manner as plaintiff. Other

provisions in the agreement similarly obligated defendants not to permit a public easement across this land to the lake.

To permit continued operation of the boat livery would adversely affect both plaintiff and those persons to whom it sold lots. It hardly need be said that potential buyers will not pay as handsomely for property fronting on a lake to which the public has access as they will for land adjacent to a body of water without public access. Nor would operation of the boat rental facility protect the reasonable reliance of previous purchasers as to the private character of the lake.

For the foregoing reasons, we reverse the trial court and direct reinstatement of the order restraining defendants from operating the boat livery. We further direct plaintiff to rough-grade a road on defendants' property if request therefor is made within a reasonable time.

Reversed. Plaintiff may tax costs.

R. B. BURNS, P. J., concurred.

HOLBROOK, J. *(dissenting)*. This equity action was brought by plaintiff-appellant, Middleton Development Corporation, against defendants-appellees, Donald Gust and Jean C. Gust, for injunctive relief.

The facts are well stated in the trial judge's opinion which is as follows:

"In this matter the plaintiff is a development corporation which owns land that adjoins defendants' land. On October 1, 1965 the parties entered into an agreement, in writing, whereby defendants granted to plaintiff the right to flow and reflow an area of approximately 5 feet higher than the existing water level on defendants' property in exchange for plaintiff agreeing to rough

grade a right-of-way on defendants' land, from the south line on the east side of the proposed lake, approximately 150 feet from the proposed water line when the lake is raised around the north end of the lake to defendants' south line on the west side of the lake. Defendants also agreed that in the event that they subdivided their property, on the proposed lake, they would not sell more than two rows of lots at the fronting on the lake, and that they would restrict their property in the same manner as the restrictions to be imposed by plaintiff on its land, which restrictions may be made a part of the proposed flowage easement. The court cannot tell from the agreement and the proofs do not indicate whether or not a written flowage easement was entered into between the parties at the time the agreement was entered into or not. Defendants also agreed that they would not permit a public easement on the lands which they own with access to the lake, and further that they would give plaintiff the first option to purchase, in the event they decided to sell or offer for sale, their lands adjoining the lake.

"Proofs also indicated that it was defendants' understanding and the court also finds that at the time that the agreement was entered into it was also plaintiff's understanding that defendants' road would be put in for them by plaintiff within a year.

"However, proofs indicate that it was not until the late summer of 1968 before the water, being raised by the dam constructed by the plaintiff, had reached its proper level so that plaintiff knew that it could be contained and kept at this level. The court finds that the plaintiff had a valid excuse for not putting in defendants' road within one year as the plaintiff was not sure that the lake project was going to be a success with the water being able to be maintained at a proper height until late summer of 1968.

"The court also finds that it would be very inequitable to terminate or cancel the written agreement of October 1965 when the plaintiff has gone to the time and expense of constructing a dam and raising the water level so that a large lake has been created by plaintiff, which is of much benefit to defendants. Thus, the court cannot in equity and good conscience termi-

nate the agreement between the parties. By the same token the court cannot alter or change the agreement.

"The court finds that the plaintiff has a flowage right on defendants' property of approximately five feet higher than the existing water level on defendants' land on October 1, 1965. The court further finds that it is plaintiff's obligation to rough grade a right-of-way on defendants' land commencing at the south line on the east side of the proposed lake approximately 150 feet from the present water line to defendants' south line on the west side of the lake and said route shall be graded and ditched so that defendants may apply gravel to complete the road. If any culverts are necessary, said culverts are to be installed by plaintiff when rough grading said road for defendants. The defendants may request said road to be built any time during the years 1971, 1972, or 1973. If defendants do not request plaintiff to build said road within said time, then plaintiff's obligation to build said road ceases.

"The court is not able to make any determination as to any restrictions on the property as no proofs were offered on this point."

There is only one issue raised on appeal and it is restated as follows: Did the trial court err in deciding that defendants' operation of a boat livery upon the property did not constitute the permitting of a "public easement" and was, therefore, not violative of the written agreement between the parties?

The provision in the contract pertaining to this issue reads as follows: "First parties further agree that they will not permit a public easement on the lands which they own with access to the lake".

Plaintiff first contends that the phrase "public easement" as used in the written agreement is ambiguous and necessitates judicial interpretation and thus requires application of the criteria for construction customarily utilized in such situa-

tions as stated in *Moore v Kimball,* 291 Mich 455, 461 (1939), as follows:

> "Where the language of an agreement is susceptible to more than one meaning, it is construed in the light of circumstances surrounding its execution, the relation of the parties, the nature of the subject matter, and the apparent purpose in making the agreement; *but these considerations do not apply when the language of the agreement leaves no doubt as to its meaning.* In such a case, it must be considered without regard to extraneous facts. See 13 C. J. p. 544. The intention of the parties is to be deduced from the language employed by them. The question is not what intention existed in the minds of the parties, but what intention was expressed in the language used; *and where unambiguous, the terms of the restrictions are conclusive."* (Emphasis supplied.)

However, the underlined material clearly indicates the judicial construction or interpretation of contractual provisions is only required by the existence of clear ambiguity. As stated in 17 Am Jur 2d, Contracts, § 241, pp 625–626:

> "As a general proposition, where the terms of a writing are plain and unambiguous, there is no room for construction, since the only office of judicial construction is to remove doubt and uncertainty. It is fundamental that the principles of construction cannot be applied to vary the meaning of that which is otherwise clear and unambiguous, and, in this respect, it is to be noted that if the language of the contract is plain and unambiguous, the intention expressed and indicated thereby controls, rather than whatever may be claimed to have been the actual intention of the parties."

17 Am Jur 2d, Contracts, § 247, p 639, states:

> "Generally, words in a contract are to be given their usual and primary meaning at the time of the execu-

tion of the contract. The mere fact that at the time of suit the parties do not agree upon the proper construction of their unambiguous language does not make it ambiguous."

and 17 Am Jur 2d, Contracts, § 249, p 642, concludes:

"Where words or terms having a definite legal meaning and effect are knowingly used in a written contract or other instrument, the parties thereto will be presumed to have intended such words or terms to have their proper legal meaning and effect, in the absence of any contrary intention appearing in the instrument."

In order to prevail herein plaintiff must demonstrate that the phrase "public easement" as used in the written agreement between the parties is so nebulous and ambiguous as to necessitate judicial construction by resort to extrinsic evidence. This the plaintiff has failed to do. Contrary to plaintiff's contention, there is nothing inherent in the term "public easement" and nothing in the evidence of this case that indicates such ambiguity as to require the judicial construction urged by plaintiff.

In 28 CJS, Easements, § 3e, pp 630–631, it states:

"Easements may also be classified as private or public, accordingly as they are enjoyed by an individual or by the public. Private easements are independent of public easements; the distinguishing feature is that in case of private easements there must be two distinct tenements, one dominant and the other servient, whereas, public easements on the other hand are in gross, and in this class of easements there is no dominant tenement, as announced infra § 4."

In 35 Words and Phrases, p 151, public easement is defined, quoting the law in the state of New Jersey, *viz.:*

" 'The "public easement," as interpreted in this state, is primarily a right of passage over the surface of the highway and of so using and occupying the land within it as to facilitate such passage. In this primary right are included the grading, paving, cleaning, and lighting of the highway, the construction and maintenance of street railways with the apparatus proper for their use, and the maintenance of appliances conducive to the protection and convenience of travelers.' The right of a telephone company to erect a telephone line within the limits of a public highway, upon land the fee of which is owned by private persons, imposes an additional servitude upon the fee, and can be acquired against such persons only by the exercise of eminent domain. *Nicoll v New York & N.J. Telephone Co,* 42 A 583, 584; 62 NJL 733, 735; 72 Am St Rep 666 [1899]."

The Court in the case of *City of Birmingham v Graham,* 202 Ala 202, 204; 79 So 574, 576 (1918), stated:

"A dedication or public easement in land is generally defined as its devotion to a public use, by an unequivocal act of the owner of the fee, manifesting the intention that it shall be accepted and used presently or in futuro."

Also see *Stollenwerck v Greil,* 205 Ala 217, 219; 87 So 338, 340 (1921).

Plaintiff asserts that the case of *Delmarva Power & Light Co of Maryland v Eberhard,* 247 Md 273, 275, 277; 230 A 2d 644, 645, 646–647 (1967), supports its argument that the phrase "public easement" is inherently ambiguous. In that case the Court stated:

"One who must decide the meaning of the term 'public easements' in the context of the statute, Code (1957), Art. 81, § 112, which makes a decree in a proceeding to foreclose the right of redemption of property sold for taxes final and conclusive and which vests in the plaintiff 'an absolute and indefeasible title in fee

simple in the property, free and clear of all * * * encumbrances thereon, except * * * public easements to which the property is subject,' must be reminded of Shakespeare's thought in Act I, Scene 3, of the *Merchant of Venice* that 'the devil can cite Scripture for his purpose.'

"One view is that a public easement is one which gives the individual members of the general public a right of passage over or the use of delineated or ascertainable areas of land or water (and probably less well-delineated areas of air); another view, more amorphous, is that included in the concept of a public easement is an easement which a public utility or public service corporation could acquire by condemnation because it could be so acquired only for a public use."

The Court enumerated the sole issue in the case as follows:

"The close point in the case is whether the easement which a public service corporation has to permit the passage of cars or to facilitate the transmission of water, sewage, oil, gas, electricity and sludge so as to enable it to fulfill its function of serving the public is a public easement."

* * *

"We think the easement here involved was a private easement or, at the most, only a quasi public easement. A private easement ordinarily has a dominant tenement to which the right belongs and a servient tenement upon which it rests. 3 Tiffany, Real Property, § 758 (3d ed.). A public easement is appurtenant to nothing, having no dominant tenement, and is an easement in gross. *Maryland & Pa. R.R. Co v Silver,* 110 Md 510, 73 A. 297 [1909]; 28 C.J.S. Easements § 3(e)."

The *Delmarva* case upon which plaintiff relies is not sufficient to sustain plaintiff's position in the instant case. While *Delmarva* recognizes other public rights which might be classified as "public easements" it is important to notice that the items

so classified are clearly denominated as rights existing in the general public. The distinction between a right existing in the *general public* as recognized in *Delmarva* and the privilege conferred upon a licensee who rents one of defendants' boats herein is both fundamental and immense. There is no argument nor indication in the facts of this case that defendants' boat livery operation created any *rights in the general public* nor is it claimed that defendants conveyed any property interest to the general public or to a public service corporation or to a public utility. The *Delmarva* case, instead of bolstering plaintiff's position, rather illustrates that defendants' conduct nowhere falls within the ambit of permitting a "public easement" as prohibited by the written agreement.

Plaintiff further relies upon *McIntosh v Groomes,* 227 Mich 215 (1924), and *Keller v Paulos Land Co,* 381 Mich 355 (1968), to support its contention that judicial construction of the term "public easement" is necessary in the instant case. Both of these cases are distinguishable. In *McIntosh* there was a patent ambiguity which was apparent from a perfunctory reading of the contractural language itself. The Court recognized this and permitted extrinsic evidence in judicially construing the contract. In *Keller* the language at issue provided for a nonexclusive easement of ingress and egress. The Court recognized that the dispute in that case "does not involve the question of the existence of an easement" but rather concerned "the scope or use to which the easement granted by the land contract may be employed". When the location of the granted easement was illustrated on a drawing it became readily apparent that the easement as described in the contract

was landlocked and could therefore not serve as a method of ingress and egress within the common legal meaning. It was only after this showing of impossibility that caused the Court to hold the easement term ambiguous and then resort to extrinsic evidence to determine the intent of the parties, for the granting language could be effectuated in no other way. The fact situation in *Keller* is readily distinguishable from that obtaining in the case at bar.

The trial court in the instant case did not err either in its factual determinations nor in its legal conclusion that defendants' operation of a boat livery did not constitute the permitting of a "public easement" on defendants' land in violation of the written agreement.

We review chancery cases *de novo* on the record giving considerable weight to the findings of the trial court. *Christine Bldg Co v City of Troy,* 367 Mich 508 (1962); *Rice v Naimish,* 8 Mich App 698, 706 (1967). The findings and decision of the trial court are upheld unless this Court is convinced it would have been compelled to reach a different result had it been in the trial court's position. *Gamble v Hannigan,* 38 Mich App 500 (1972); *Rose v Fuller,* 21 Mich App 172 (1970); *Georges v Ballard,* 20 Mich App 554 (1969). Having determined that the trial judge was correct in his findings of fact and the application of the law to those facts it is evident that the judgment should be affirmed.

Affirmed with costs to the defendants.